******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JUAN B. INGLES *v.* MARIBEL C. INGLES
## (AC 44151)

Suarez, Clark and Sheldon, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court
dissolving her marriage to the plaintiff and making certain financial
orders and denying her motion for contempt. Before trial, the parties
had entered into a stipulation in which the plaintiff agreed to make
mortgage payments on the marital home. The trial court denied the
defendant's subsequent motion for contempt, in which she alleged that
the plaintiff failed to pay past due mortgage payments, on the ground
that his failure to pay the mortgage was not wilful. Each party was
employed at the time of trial and had a pension associated with that
employment. The parties were unable to agree on a professional evalua-
tor to value the pensions and, at trial, neither party presented testimony
from an actuary as to the value of the pensions. The court awarded the
defendant the marital home, ordered that the plaintiff transfer 75 percent
of his 457 (b) retirement plan to the defendant, and ordered the plaintiff
to pay the defendant periodic alimony in the amount of $250 per week
for two years, to support the defendant while she refinanced the mort-
gage on the marital home. The court ordered that each party would
retain sole ownership of his or her pension. *Held*:

1. The trial court correctly concluded that the plaintiff was not in contempt
   for failing to comply with a pendente lite order: the court did not find
   that the plaintiff was in wilful noncompliance of its order that he make
   certain mortgage payments, which the defendant, as the party seeking
   the order of contempt, had the burden to prove by clear and convincing
   evidence; in the present case, even though the court found that the
   plaintiff was late in making certain mortgage payments, it did not find
   that the plaintiff failed to make his best effort to make timely payments
   in violation of its order or that any such violation was wilful, and,
   because the court determined that the defendant failed to establish a
   prima facie case of contempt, the burden of production did not shift to
   the plaintiff to provide evidence in support of a defense of inability to
   comply with the court's order.

2. The defendant could not prevail on her claim that the trial court's periodic
   alimony award was an abuse of its discretion: the court's award of time
   limited alimony was for a permitted purpose in that it provided interim
   support to the defendant until she was able to either refinance the
   mortgage or to list the marital home for sale, and the two year duration
   of the award was not arbitrary because it was connected to the court's
   order to refinance the mortgage in that time frame and was consistent
   with the defendant's proposed orders in which she specifically requested
   a two year time period to pursue refinancing; moreover, the court did
   not fail to consider the factors set forth in the applicable statute (§ 46b-
   82), including the parties' needs, sources of income and employment,
   as the court explicitly stated that it had considered the statutory criteria
   for its award, and the record reflected that the court considered the
   plaintiff's ability to earn income from overtime and extra duty pay
   because such income was reflected on his financial affidavit, which
   the court specifically referenced in its memorandum of decision in its
   assessment of the plaintiff's income.

3. Contrary to the defendant's claim, the trial court did not improperly fail
   to value the parties' pensions and equalize their distribution: the court
   did not remove the parties' pensions from the scales in determining an
   equitable division of the parties' property but, instead, stated that both
   parties were entitled to a pension on retirement and that it took that
   into consideration in fashioning its financial orders, and the defendant
   could not assert that the court improperly failed to value the parties'
   pensions given the scant evidence presented by the parties; moreover,
   the court was not required to "equalize" the pensions pursuant to the
   present division method and to distribute 50 percent of each pension
   to the parties, as the court is not required to distribute the pensions

equally, or at all, for its order to be equitable, and this court could not conclude that the court's order declining to award the defendant a portion of the plaintiff's pension was inequitable in light of the totality of the court's financial awards.

4. The trial court did not abuse its discretion in declining to award the defendant attorney's fees: the defendant did not demonstrate how the court's failure to award her attorney's fees undermined the court's other financial orders because, when the court's orders are viewed as a whole, the court reasonably could have concluded that the defendant had sufficient funds to pay her attorney's fees without any risk of undermining the efficacy of the court's other financial orders, because, in addition to being awarded periodic alimony and a portion of the plaintiff's 457 (b) plan, the defendant continued to receive income from her employment and her financial affidavit indicated that she had money in checking and savings accounts.

Argued March 2—officially released December 6, 2022

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendant filed a cross complaint; thereafter, the defendant filed a motion for contempt; subsequently, the matter was tried to the court, *Hon. James G. Kenefick, Jr.*, judge trial referee; judgment dissolving the marriage and granting certain other relief, and denying the defendant's motion for contempt, from which the defendant appealed to this court. *Affirmed.*

*Randi L. Calabrese*, with whom, on the brief, was *Mohan Sreenivasan*, for the appellant (defendant).

*Joseph A. DiSilvestro*, for the appellee (plaintiff).

*Opinion*

SUAREZ, J. The defendant, Maribel C. Ingles, appeals from the judgment of the trial court dissolving her marriage to the plaintiff, Juan B. Ingles, and denying her motion for contempt. On appeal, the defendant claims that the court (1) misapplied the law when it found that the plaintiff was not in contempt for allegedly failing to comply with a pendente lite order, (2) abused its discretion in awarding her alimony in the amount of $250 per week for a period of two years, (3) improperly failed to value the parties' pensions and equalize their distribution, and (4) abused its discretion in declining to award her attorney's fees. We affirm the judgment of the trial court.

The following facts, which were either found by the court or are otherwise undisputed, and procedural history are relevant to our resolution of this appeal. The plaintiff and the defendant were married on August 7, 1999, and have two children together.[1] In January, 2019, the plaintiff commenced a dissolution action. At the time of the dissolution proceeding, the plaintiff was fifty years old and working as a detective with the New Haven Police Department, where he had been employed since 2002. The plaintiff had been involved in a serious accident while working and had a pending civil action and a workers' compensation claim arising from that accident. Although he experienced some medical issues as a result of the accident, he had returned to working full-time by the time of the dissolution proceeding. The defendant was fifty-three years old and working as a social worker case aide with the Department of Children and Families, where she had been employed since 1998. The defendant was in good health, although she was "dealing with several medical issues, at least one of which involve[d] workers' compensation." She was working toward obtaining a bachelor's degree in psychology from Albertus Magnus College, which she hoped to complete in the spring of 2021.

On March 18, 2020, after a trial that lasted for three days, the court, *Hon. James G. Kenefick, Jr.*, judge trial referee, issued a memorandum of decision dissolving the parties' marriage and issuing certain financial orders related to alimony and the division of the parties' marital property. The court concluded that the parties' marriage had broken down irretrievably and found the plaintiff to be more at fault than the defendant for that breakdown, as he "had several affairs of a somewhat brief nature a number of years ago and, although [the parties] had reconciled at times, [the defendant had] lost trust in him."

The court awarded the defendant the marital home, located in East Haven, which had been purchased by the parties in 2007, and, at the time of trial, had a value of $305,000, with $71,000 in equity. The court ordered

the plaintiff to quitclaim his interest in the property to the defendant and ordered the defendant to refinance the mortgage within two years. The court ordered that, if the defendant could not refinance the mortgage within two years, the property was to be sold and the defendant was to retain any net proceeds or be responsible for any deficiency. The court further ordered, among other things, that the plaintiff transfer 75 percent of his 457 (b) retirement plan to the defendant, that both parties retain their respective pensions, that each party retain his or her own personal injury claims, lawsuits, and workers' compensation benefits, and that each party be responsible for the outstanding balances owed to his or her own attorneys in connection with the dissolution proceedings. The court ordered the plaintiff to pay the defendant periodic alimony in the amount of $250 per week for a period of two years, in order to provide support to the defendant while she refinanced the mortgage on the marital home.

In its memorandum of decision dissolving the parties' marriage, the court also denied motions for contempt that the defendant had filed on December 11, 2019, and February 6, 2020, related to the plaintiff's continued obligation to make mortgage payments on the marital home while the dissolution action was pending.

On April 7, 2020, the defendant filed a motion for reconsideration, reargument, and clarification of the court's decision regarding, in relevant part, the duration and amount of the alimony award, the division of the parties' retirement assets, and attorney's fees. The court summarily denied the defendant's motion. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court improperly denied her December 11, 2019 motion for contempt. Specifically, the defendant argues that the court improperly placed the burden on her to demonstrate that the plaintiff's alleged noncompliance with the court's order was wilful and, in doing so, failed to shift the burden to the plaintiff to demonstrate, as a defense, his inability to comply with the order. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. During the parties' marriage, the plaintiff paid the mortgage on their marital home and the defendant paid for most of their remaining household expenses, such as for utilities and food. During the pendency of the dissolution action, the parties entered into a pendente lite stipulation, in which the plaintiff agreed, among other things, to "continue making all mortgage payments, ongoing, as they come due." The stipulation also provided that the plaintiff was responsible for any fees associated with late payments, as well as past due payments not paid to date.[2] The

stipulation was approved by the court and entered as an order. On July 25, 2019, the defendant filed a motion for contempt, alleging that the plaintiff had wilfully violated the court's order by failing to pay the past due mortgage payments and associated late fees, which amounted to $7724.44.

On October 9, 2019, after a hearing, the court denied the defendant's July 25, 2019 motion for contempt, finding that "the mortgage for the marital home is currently in arrears for the month of September, 2019, and is in the payment grace period for the month of October, 2019, as of the date of this order entering. However, the court does not find the [plaintiff's] failure to pay the mortgage during this period to be wilful." In addition, the court ordered that "[t]he [plaintiff] shall pay the September and October, 2019 mortgage payments no later than [October 16, 2019], and shall continue to pay the mortgage each month until further order of the court. The [plaintiff] shall make his best effort to make all future mortgage payments on time."

The defendant subsequently filed a motion for contempt on December 11, 2019, regarding the plaintiff's alleged wilful noncompliance with the terms of the court's October 9, 2019 order. The defendant claimed that the plaintiff had failed to make the November and December, 2019 mortgage payments in a timely manner and, therefore, a balance of $5672.39 remained past due.

The December 11, 2019 motion for contempt was heard together with the underlying dissolution action. With respect to the motion for contempt, the defendant offered as evidence letters from the parties' mortgage subservicing company, dated November 4, 2019, and December 4, 2019, advising the parties that their mortgage was two months past due. The plaintiff testified that he made a payment on December 10, 2019, which was reflected in a subsequent statement from the parties' mortgage servicing company. The plaintiff acknowledged that he previously made late mortgage payments but explained that he was currently up to date on those payments, apart from a "past due amount" of approximately $749 in certain fees and charges. The plaintiff testified concerning his expenses, including his credit card bills and the $1100 in rent that he paid monthly for his current residence,[3] in addition to the approximately $2400 in monthly mortgage payments on the marital home. The plaintiff testified that he "struggle[s]" to pay his bills each month, asserting that "I don't have enough [money] to manage to pay them all on time." The plaintiff further testified that "[t]he mortgage was getting paid as soon as I possibly could and then the rent," as he asked his landlord to allow him to be behind on the rent payments in order to prioritize the mortgage payments.

In its memorandum of decision dissolving the parties' marriage, the court denied the defendant's December

11, 2019 motion for contempt.[4] The court reasoned: "Although the [plaintiff] has been late in making [mortgage] payments, the [defendant] has not met her burden of proof that these late payments were wilful." The court ordered, in its property division of the marital home, that "the [plaintiff] shall be responsible for the March, 2020 mortgage payment and any outstanding fees and charges which shall be promptly paid."

We begin with the following legal principles that guide our analysis of the defendant's claim. "[C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . In part because the contempt remedy is particularly harsh . . . such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring . . . rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. . . .

"To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. . . . The inability of a party to obey an order of the court, without fault on his part, is a good defense to the charge of contempt. . . .

"It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . If the moving party establishes this twofold prima facie case, the burden of production shifts to the alleged contemnor to provide evidence in support of the defense of an inability to comply with the court order." (Citations omitted; internal quotation marks omitted.) *Puff* v. *Puff*, 334 Conn. 341, 364–65, 222 A.3d 493 (2020); see also *Eldridge* v. *Eldridge*, 244 Conn. 523, 532, 710 A.2d 757 (1998) ("The inability of a party to obey an order of the court, without fault on his part, is a good defense to the charge of contempt. . . . The contemnor must establish that he cannot comply, or was unable to do so." (Citation omitted; internal quotation marks omitted.)). "[E]ven in the absence of a finding of contempt, a trial court has broad discretion to make whole any party who has suffered as a result of another party's failure to comply with a court order." (Internal quotation marks omitted.) *O'Brien* v. *O'Brien*, 326 Conn. 81, 99, 161 A.3d 1236 (2017).

Whether the trial court applied the correct legal standard to the defendant's motion for contempt is a question of law subject to plenary review. See, e.g., *Dowling* v. *Heirs of Bond*, 345 Conn. 119, 143 n.20, 282 A.3d 1201 (2022). "The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . If we answer that question affirm-

atively, we then review the trial court's determination that the violation was wilful under the abuse of discretion standard." (Citation omitted.) *Puff* v. *Puff*, supra, 334 Conn. 365–66.

In the present case, the court did not find that the plaintiff was in "wilful noncompliance" of the October 9, 2019 order, which the defendant, as the party seeking the order of contempt, had the burden to prove by clear and convincing evidence. See id., 365; see also *Birkhold* v. *Birkhold*, 343 Conn. 786, 811, 276 A.3d 414 (2022) ("[i]t is the *burden of the party seeking an order of contempt to prove*, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and *the alleged contemnor's wilful noncompliance* with that directive" (emphasis added; internal quotation marks omitted)). In other words, even though the court found that the plaintiff had been late in making certain mortgage payments, it did not find that the plaintiff had failed to make his "best effort" to make those mortgage payments on time, in violation of the court's order, or that any such violation was "wilful." Thus, the court determined that the defendant failed to establish a prima facie case of contempt[5] and, therefore, the burden of production did not shift to the plaintiff to provide evidence in support of a defense of inability to comply with the court's order.

Accordingly, we conclude that the court correctly placed the burden on the defendant to demonstrate the plaintiff's wilful noncompliance with the court's order, and, on the basis of the evidence presented, the court did not abuse its discretion by declining to hold the plaintiff in contempt.

II

The defendant next claims that the court abused its discretion in awarding her alimony in the amount of $250 per week for a period of two years. Specifically, she argues that (1) "there is no support or logic to the court's limitation of alimony" to a duration of two years, and (2) in calculating the alimony award, the court failed to consider certain factors set forth in General Statutes § 46b-82, including the parties' needs, sources of income, and employability. We disagree.

The following additional facts are necessary to our consideration of this claim. During the dissolution proceedings, the parties' submitted several financial affidavits stating, among other things, their weekly incomes and expenses. The most recent financial affidavits before the court at the time of its decision were filed by the plaintiff on December 20, 2019, and by the defendant on February 6, 2020.

The plaintiff's December 20, 2019 financial affidavit indicated that his gross weekly income was $1995, with the inclusion of certain overtime and extra duty pay, and that his net weekly income was $1305. The defendant's

February 6, 2020 financial affidavit indicated that her gross weekly income was $1167, and that her net weekly income was $825.

In her proposed orders to the court, the defendant requested alimony in the amount of $650 per week for the remainder of her lifetime or, in the alternative, $450 per week plus 50 percent "of all monies derived from [the plaintiff's] additional income, including, but not limited to, overtime and extra duty performed at his current job." She also requested that she retain the marital home, including 100 percent of the parties' equity in the home, and that "[t]he plaintiff shall remain on the mortgage for two years, at which time the house [will] be sold should the defendant be unable to refinance." The plaintiff, in his proposed orders, requested that "[n]either party shall pay nor receive periodic alimony" and, instead, the defendant could retain the plaintiff's one-half share of equity in the marital home, valued at $35,500, as a "lump sum alimony buyout . . . ." The plaintiff further requested that the defendant "immediately" refinance the mortgage and that, if she was unable to refinance within 120 days, the marital home would be listed for sale.

At trial, the defendant confirmed her desire to keep the marital home and to pursue refinancing of the mortgage. She testified that she previously had tried to refinance the mortgage but could not, because her credit was "really, really bad" due to the home going into foreclosure in 2011 and because her income was insufficient to sustain the home.

When the court asked the defendant whether she believed she could afford the home given her current income, the defendant responded, "I don't know." She subsequently testified that she put approximately $800 per month into Christmas club and vacation club accounts through her employment, and that such funds could be available to pay household bills, even though she was not currently using the funds for that purpose.[6]

In its memorandum of decision dissolving the parties' marriage, the court stated that it "carefully considered the testimony of the parties and witnesses, documents entered into evidence, the financial affidavits of the parties, their proposed orders, the court file, and the statutory criteria and case law for . . . the award of alimony . . . . " The court indicated that the parties' "gross and net incomes are as set forth on their financial affidavits" and specifically referenced the plaintiff's December 20, 2019 financial affidavit and the defendant's February 6, 2020 financial affidavit.

The court ordered the plaintiff to pay the defendant alimony as follows: "The [plaintiff] shall pay to the [defendant] periodic alimony in the amount of [$250] per week . . . . Alimony shall terminate upon the death of either party, the remarriage or civil union of

the [defendant] or two . . . years from the date of this order, whichever event first occurs, and shall be modifiable including termination in accordance with the provisions of [General Statutes] § 46b-86 . . . . The term of alimony shall be nonmodifiable except it may end sooner as stated above. . . . The purpose of the alimony is to give the [defendant] time to refinance the family home in order to remove the [plaintiff] from the current note and mortgage.''

The following legal principles guide our analysis of the defendant's claim. ''We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action.'' (Citation omitted; internal quotation marks omitted.) *Horey* v. *Horey*, 172 Conn. App. 735, 740, 161 A.3d 579 (2017).

''The generally accepted purpose of . . . alimony is to enable a spouse who is disadvantaged through divorce to enjoy a standard of living commensurate with the standard of living during marriage. . . . In addition to the marital standard of living, the trial court must also consider the factors in . . . § 46b-82 when awarding alimony. . . .

''[Section] 46b-82 (a) provides in relevant part that [i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the [division of property made] pursuant to [General Statutes §] 46b-81 . . . . The court is to consider these factors in making an award of alimony, but it need not give each factor equal weight. . . . We note also that [t]he trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case. . . . There is no additional requirement that the court specifically state how it weighed the statutory criteria or explain in detail the importance assigned to each statutory factor.'' (Internal quotation marks omitted.) *Reinke* v. *Sing*, 186 Conn. App. 665, 689–90, 201 A.3d 404 (2018).

''Time limited alimony is often awarded. . . . The trial court does not have to make a detailed finding justifying its award of time limited alimony. . . . Although a specific finding for an award of time limited alimony is not required, the record must indicate the basis for the trial court's award. . . . There must be

sufficient evidence to support the trial court's finding that the spouse should receive time limited alimony for the particular duration established. If the time period for the periodic alimony is logically inconsistent with the facts found or the evidence, it cannot stand. . . . In addition to being awarded to provide an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency, time limited alimony is also appropriately awarded to provide interim support until a future event occurs that makes such support less necessary or unnecessary." (Internal quotation marks omitted.) *O'Neill* v. *O'Neill*, 209 Conn. App. 165, 177, 268 A.3d 79 (2021).

On appeal, the defendant first argues that the court's "expressly stated purpose in awarding alimony . . . to give [her] time to refinance the family home in order to remove the [plaintiff] from the current note and mortgage . . . is improper" and, "even if it was proper, the time period of two years is arbitrary and has no evidentiary support." (Internal quotation marks omitted.)

The court's award of time limited alimony, however, is for a permitted purpose in that it "provide[s] interim support until a future event occurs that makes such support less necessary or unnecessary." (Internal quotation marks omitted.) *O'Neill* v. *O'Neill*, supra, 209 Conn. App. 177. In the present case, that "future event" is either that "[t]he [defendant] shall refinance said mortgage within two years to remove [the plaintiff's] name" or, "[i]n the event the property has not been refinanced within two years, it shall be listed for sale and aggressively marketed for sale immediately at the end of the two years." Moreover, the two year duration of that time limited alimony is not arbitrary, as it also is connected to the court's order to refinance the mortgage. Additionally, the court's award is consistent with the defendant's proposed orders, in that the defendant specifically requested a two year time period to pursue refinancing. Accordingly, the court did not abuse its discretion in structuring the alimony award as it did.

The defendant next argues that "the court failed to consider all of the statutory factors required by . . . § 46b-82, including the parties' needs, sources of income, and employability." She contends that the court "relied solely on the parties' financial affidavits to determine the parties' relative incomes . . . despite a wealth of evidence demonstrating that the plaintiff's earning capacity and actual income were much higher than that reflected on his final financial affidavit" as a result of his ability to earn additional income from overtime and extra duty pay.[7] She further argues that the court failed to consider that she "has a limited earning capacity, insofar as she cannot retire for quite some time, and [cannot] supplement her base salary with overtime, extra duty, or additional employment,"

whereas the plaintiff can.

The court, however, explicitly stated that it had considered the statutory criteria for its award of alimony. The record reflects that the court also had considered the plaintiff's ability to earn income from overtime and extra duty pay, because such income was reflected on the plaintiff's December 20, 2019 financial affidavit, which the court specifically referenced in its memorandum of decision to assess the plaintiff's income, and incorporated into the plaintiff's total gross and net weekly incomes listed on that form.[8] Although the defendant emphasizes that the plaintiff's income from overtime and extra duty pay varied from the amounts listed on his previously filed financial affidavits, the plaintiff explicitly noted on those forms that his overtime was "not guaranteed," and explained at trial that the availability of overtime and extra duty work fluctuated.

The defendant's assertion that the court should have based its alimony award on the parties' respective earning capacities, rather than their actual incomes, merits little consideration. The fact that a court may consider a party's earning capacity does not mean that it is required to do so. It is well settled that "[w]hether to base its financial orders on the parties' actual net income or their earning capacities is left to the sound discretion of the trial court." *Buxenbaum* v. *Jones*, 189 Conn. App. 790, 801, 209 A.3d 664 (2019). Accordingly, we conclude that the court did not abuse its discretion in awarding alimony to the defendant in the amount of $250 per week for a period of two years.

### III

The defendant next claims that the trial court improperly failed to value the parties' pensions and "equalize" their distribution. We disagree.

The following additional facts are necessary to our consideration of this claim. As mentioned previously in this opinion, both parties have retirement assets. The defendant has a pension with the state of Connecticut,[9] and the plaintiff has a pension with the city of New Haven in addition to a 457 (b) retirement plan. The plaintiff valued his 457 (b) retirement plan at $40,095.

During the pendency of the dissolution action, the parties agreed "to equally pay for the valuations of both pensions" and that the "evaluator [would] be agreed upon through counsel . . . ." The parties, however, were unable to agree on a professional evaluator. At trial, neither party presented testimony from an actuary with respect to the value of their pensions. Instead, the parties continually marked the value of their respective pensions as "unknown" on their financial affidavits.

Regarding his pension, the plaintiff testified that he had been employed by the New Haven Police Department for approximately eighteen years, since October,

2002, and, before that, he had worked as a custodian for the city of New Haven for approximately six years and that he had been in the military. The plaintiff explained that his pension from the custodian position was "rolled over" into his pension from the police department. The plaintiff further explained that he was eligible to retire from the police department on October 17, 2022, after twenty years of service. He offered as an exhibit a pension benefit calculation from the city of New Haven. On the basis of a retirement date of October 17, 2022, the pension benefit calculation indicated that the plaintiff would receive annual pension benefits in the amount of $79,328.42, with a monthly payment of $6610.70.

The defendant presented testimony from Jessica Criscuolo, the payroll supervisor for the city of New Haven, who produced a different pension benefit calculation as to the plaintiff's pension. Criscuolo testified that she believed the plaintiff was eligible to retire that month, because he had "bought back" 6.48 years of service, either from his custodian position or his time in the military, and she was "assuming that [the plaintiff] will buy back two more [years] . . . with his sick time to make him eligible." Criscuolo's pension benefit calculation indicated that, on the basis of a retirement date of December 17, 2019, the plaintiff would receive annual pension benefits in the amount of $70,372.84, with a monthly payment of $5864.40.

The only exhibit presented at trial regarding the defendant's pension, which had been offered by the plaintiff, was a letter from a retirement counselor at the State Employees Retirement Commission, dated October 31, 2019. The letter, addressed to the defendant, stated: "If you left state employment today and elected to commence benefits [under the early retirement provisions] effective July 1, 2021 the first of the month following your fifty-fifth birthday, with [twenty-one] years and [four] months of credited service and an average salary of [$73,600] for your three highest paid years of state service, your yearly basic allowance would be approximately [$12,859] payable at [$1071] monthly." The letter also stated that, if the defendant retired under normal retirement provisions, and her average salary remained the same, then her "yearly basic allowance would be approximately [$21,981] payable at [$1831] monthly." The letter further explained: "Currently, your account has $23,004.52 in employee contributions and $14,850.57 in awarded interest posted to it. . . . Since the [s]tate funds [the State Employees Retirement System] on an actuarial basis there is no state contribution individually assigned to a member's account. Additionally since this office does not have actuaries on staff we are unable to provide you with information regarding the actuarial value of this benefit plan."

On February 6, 2020, the final day of trial, the defen-

dant submitted an updated financial affidavit that, for the first time, assigned a value of $37,854 to her pension. The plaintiff's counsel questioned the defendant as to how that value was calculated, and the defendant's counsel interjected and explained that the figure came from the letter from the State Employee Retirement Commission. The plaintiff's counsel argued to the court that "the problem is there's a value put on a pension and it didn't correctly value. So, it's a very small amount of money that's put on and counsel, nor am I, [are] qualified . . . [to] value pensions in order to put a number on there and to have the court rely on that as the total value of someone's pension." The defendant's counsel then explained that "this just reflects what is actually accumulated to date from the exhibit that's in evidence in terms of employee contributions plus the interest that's in it. . . . [I]t's very transparent about where it comes from." The defendant's counsel subsequently acknowledged that the value listed on the financial affidavit did not reflect the present value of the defendant's pension.[10]

In her proposed orders, the defendant requested that the court order the plaintiff to transfer 50 percent of his 457 (b) retirement plan to her. Additionally, she proposed that the court award her "the amount necessary to equalize the marital portion of his pension(s)." In his proposed orders, the plaintiff agreed that he should transfer 50 percent of his 457 (b) retirement plan to the defendant, but he requested that each party retain his or her respective pension.

In its memorandum of decision, the trial court concluded that "[n]either party has valued the state and city pensions which each is entitled to receive upon retirement. The figure of [$37,854] listed on the [defendant's] financial affidavit as the value of her state pension is not the present value of that pension. . . . [B]oth parties are entitled to a pension upon retirement and that has been taken into consideration when putting together these financial orders." The court then ordered that "[e]ach party shall retain sole ownership of their respective pension plans as listed on their financial affidavits free and clear of any claim by the other," and ordered the plaintiff to transfer 75 percent of his 457 (b) retirement plan to the defendant.

The following legal principles guide our analysis of the defendant's claim. "[Section] 46b-81 governs the distribution of the assets in a dissolution case. Section 46b-81 (a) authorizes the court to assign to either spouse all or any part of the estate of the other spouse. . . . Section 46b-81 (c) provides for the court's consideration of the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and

the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." (Internal quotation marks omitted.) *Anketell* v. *Kulldorff*, 207 Conn. App. 807, 834–35, 263 A.3d 972, cert. denied, 340 Conn. 905, 263 A.3d 821 (2021).

"[A] fundamental principle in dissolution actions is that a trial court may exercise broad discretion in . . . dividing property as long as it considers all relevant statutory criteria. . . . While the trial court must consider the delineated statutory criteria [when allocating property], no single criterion is preferred over others, and the court is accorded wide latitude in varying the weight placed upon each item under the peculiar circumstances of each case. . . . In dividing up property, the court must take many factors into account. . . . A trial court, however, need not give each factor equal weight . . . or recite the statutory criteria that it considered in making its decision or make express findings as to each statutory factor." (Internal quotation marks omitted.) *Kent* v. *DiPaola*, 178 Conn. App. 424, 431–32, 175 A.3d 601 (2017).

"As a general framework, [t]here are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within . . . § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." (Internal quotation marks omitted.) *Cunningham* v. *Cunningham*, 140 Conn. App. 676, 681, 59 A.3d 874 (2013).

It is well settled that pension benefits constitute property subject to equitable distribution under § 46b-81.[11] See, e.g., *Bender* v. *Bender*, 258 Conn. 733, 749, 785 A.2d 197 (2001); *Krafick* v. *Krafick*, 234 Conn. 783, 798, 663 A.2d 365 (1995). "Pension benefits constitute a form of deferred compensation for services rendered. . . . Pension benefits are widely recognized as among the most valuable assets that parties have when a marriage ends. . . . Nevertheless, there is no set formula that a court must follow when dividing the parties' assets, including pension benefits." (Internal quotation marks omitted.) *Kent* v. *DiPaola*, supra, 178 Conn. App. 434–35.

In *Krafick* v. *Krafick*, supra, 234 Conn. 800–804, our Supreme Court discussed three methods of valuing and distributing pension benefits. "The first, called the present value or offset method, requires the court to determine the present value of the pension benefits, decide the portion to which the nonemployee spouse is entitled, and award other property to the nonemployee spouse as an offset to the pension benefits to which he or she is otherwise entitled. . . . For defined benefit

pensions, present value represents the sum which a spouse will take at the present time in return for giving up the right to receive an unknown number of monthly checks in the future." (Citations omitted; internal quotation marks omitted.) Id., 800. "Once the court has determined the present value of the benefits at issue, it may, in light of relevant equitable considerations, award those benefits to the employee spouse and/or may offset the nonemployee's equitable share in the pension benefits with an award of other assets." Id., 801.

Calculating a pension's present value "depends on several factors, including the employee spouse's life expectancy, the proper interest rate for discount and the date of retirement," and, therefore, such a calculation requires the use of "generally accepted actuarial principles." (Internal quotation marks omitted.) Id., 800–801; see also *Bender* v. *Bender*, supra, 258 Conn. 756–57 ("[c]alculating [a pension's present value] may require taking actuarial testimony, which generally involves: (1) determining future benefits, taking into consideration the date of the employee spouse's retirement, postmarital salary, future taxes and the duration of benefits; and (2) discounting for present value, the probability of mortality and the probability of forfeiture").

The present value method "has the advantage of effecting a 'clean break' between the parties" and "avoids extended supervision and enforcement by the courts," but "[t]he drawback to the [present value] method is that it places the entire risk of forfeiture before maturity on the employee spouse." *Krafick* v. *Krafick*, supra, 234 Conn. 802. Moreover, "this method is not feasible . . . where no present value can be established [by expert testimony] and the parties are unable to reach agreement as to the value of the pension." (Citations omitted; internal quotation marks omitted.) Id.

"The second and third recognized methods for valuing and distributing pensions involve delaying distribution until the pension matures." Id., 803. Under the second method, called the "present division" method, "the trial court determines at the time of trial the percentage share of the pension benefits to which the nonemployee spouse is entitled. The court may then . . . presently divide or assign the pension benefits between the spouses. . . . In other words, the court will declare that, upon maturity, a fixed percentage of the pension be distributed to each spouse." (Citation omitted; internal quotation marks omitted.) Id. Although one disadvantage of the present division method is "the cost of prolonging the parties' entanglement with each other," a significant advantage to this approach is that it "impose[s] equally on the parties the risk of forfeiture." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 759. "This method does not require

expert testimony from an actuary"; *Kent* v. *DiPaola*, supra, 178 Conn. App. 436; and its use is "favored when . . . the evidence is inadequate to establish present value." *Krafick* v. *Krafick*, supra, 804.

Under the third method discussed in *Krafick*, called the "reserved jurisdiction" method, "the trial court reserves jurisdiction to distribute the pension until benefits have matured. Once matured, the trial court will determine the proper share to which each party is entitled and divide the benefits accordingly." (Internal quotation marks omitted.) Id., 803. Our Supreme Court has expressly rejected utilizing the reserved jurisdiction method. See *Bender* v. *Bender*, supra, 258 Conn. 761 (explaining that "the statutory scheme regarding financial orders appurtenant to dissolution proceedings prohibits the retention of jurisdiction over orders regarding . . . the division of the marital estate" (internal quotation marks omitted)).

The method of valuing and distributing pension benefits is to be left to the sound discretion of the trial court. *Kent* v. *DiPaola*, supra, 178 Conn. App. 436; see also *Bornemann* v. *Bornemann*, 245 Conn. 508, 532, 752 A.2d 978 (1998) ("[i]n selecting and applying an appropriate valuation method, the trial court has considerable discretion"). "[I]t is within the trial court's discretion . . . to choose, on a case-by-case basis, among the present value method, the present division method of deferred distribution, and any other valuation method that it deems appropriate in accordance with Connecticut law that might better address the needs and interests of the parties. . . . The touchstone of valuation, as well as the ultimate distribution of pension benefits, is the court's power to act equitably." (Citation omitted; internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 760.

On appeal, the defendant first argues that the court "improperly valued the pensions of the parties by assigning them no value in the distribution of the property." Relying heavily on *Krafick* v. *Krafick*, supra, 234 Conn. 783, the defendant also contends that the court gave "no consideration to the value of each pension."

In *Krafick* v. *Krafick*, supra, 234 Conn. 805–806, the trial court failed to consider the plaintiff's pension interest as an asset because it did not have a liquid value and the court did not employ a substitute value. Our Supreme Court concluded that it was an abuse of discretion "to reject present value or any value for vested pension benefits merely because the asset is nonliquid, thereby effectively removing that property interest from the scales in determining an equitable division of all of the property before the court." Id., 806.

The present case is distinguishable from *Krafick*. Unlike the trial court in *Krafick*, the trial court in the present case did not remove the parties' pensions from

the scales in determining an equitable division of the parties' property but, instead, explicitly stated that "both parties are entitled to a pension upon retirement *and that has been taken into consideration when putting together these financial orders*." (Emphasis added.) The court then distributed the parties' pensions in a manner consistent with the present division method, in that it assigned a "fixed percentage of the [pensions] . . . to each spouse"; *Krafick* v. *Krafick*, supra, 234 Conn. 803; by ordering that each party retain sole ownership, or 100 percent, of his or her respective pension.[12] See, e.g., *Riccio* v. *Riccio*, 183 Conn. App. 823, 824–25, 828–29, 194 A.3d 337 (2018) (trial court utilized present division method when it ordered each party to retain his or her respective pensions).

Although, in *Krafick*, our Supreme Court noted that "a trial court, when utilizing a method to ascertain the value of a pension, *should* reach that value on the record"; (emphasis added) *Krafick* v. *Krafick*, supra, 234 Conn. 804; our Supreme Court also has recognized, in *Bornemann* v. *Bornemann*, supra, 245 Conn. 535, that, "when neither party in a dissolution proceeding chooses to introduce detailed information as to the value of a given asset, neither party may later complain that it is not satisfied with the court's valuation of that asset."[13] See also id., 536 ("[i]f the parties fail to [provide the court with the approximate value of each asset], the equitable nature of the proceedings precludes them from later seeking to have the financial orders overturned on the basis that the court had before it too little information as to the value of the assets distributed").

In the present case, the defendant cannot assert that the court improperly failed to assign a specific value to the parties' pensions given the scant evidence of valuation presented by the parties. Neither party presented evidence as to the present value of their respective pensions, in the form of expert testimony or otherwise, and "[i]t is not the function of the court to make calculations of that sort to fill evidentiary gaps." *Mongillo* v. *Mongillo*, 69 Conn. App. 472, 481, 794 A.2d 1054, cert. denied, 261 Conn. 928, 806 A.2d 1065 (2002). The defendant recognizes that "the only evidence presented as to the value of [her] pension was the amount of her contributions," and, as her counsel acknowledged before the trial court, that value does not accurately reflect the pension's actual value.[14] Moreover, the defendant recognizes that "the only evidence presented regarding the plaintiff's pension [was] calculations as to the expected benefit," rather than the total present value, and the parties' calculations conflicted. The court, therefore, was unable to assign a specific value to the parties' pensions.

To the extent that the defendant also contends that the court was required to "equalize" the parties' pensions pursuant to the present division method and to

distribute 50 percent of each pension to the parties, we disagree. The court is not required to distribute the pensions equally, or at all, for its order to be equitable. See, e.g., *Casey* v. *Casey*, 82 Conn. App. 378, 387, 844 A.2d 250 (2004) (no abuse of discretion when court ordered that both parties retain their own pensions, as "the court was not obligated to divide equally, or in any manner, the portion of the parties' pensions that accrued during the term of the marriage").

Moreover, we are not persuaded by the defendant's argument that the court's order was inequitable because "her pension benefits and earning capacity are substantially less than the plaintiff's," given the entire mosaic of the court's judgment. Section 46b-81 (a) "permits the farthest reaches from an equitable division as is possible, allowing the court to assign to either the husband or wife all or any part of the estate of the other. . . . On the basis of the plain language of § 46b-81, there is no presumption in Connecticut that marital property should be divided equally prior to applying the statutory criteria. . . . [I]ndividual financial orders in a dissolution action are part of the carefully crafted mosaic that comprises the entire asset reallocation plan. . . . Under the mosaic doctrine, financial orders should not be viewed as a collection of single disconnected occurrences, but rather as a seamless collection of interdependent elements." (Citation omitted; internal quotation marks omitted.) *Riccio* v. *Riccio*, supra, 183 Conn. App. 827. In the present case, although the court ordered the parties to retain their respective pensions, it awarded the defendant, among other things, 75 percent of the plaintiff's 457 (b) retirement plan, which amounted to approximately $30,071, beyond that which the defendant had requested in her proposed orders, the marital home, which had equity in the amount of $71,000, and alimony in the amount of $250 per week for a duration of two years.

Considering the totality of the court's financial awards, we cannot conclude that the court's order, which declined to award the defendant a portion of the plaintiff's pension, was inequitable. See *Riccio* v. *Riccio*, supra, 183 Conn. App. 824–27 (no abuse of discretion in distribution of retirement assets when court distributed portion of 401 (k) plan but ordered that "[t]he parties shall retain, free and clear of any claim by the other, their defined benefit plans" (internal quotation marks omitted)); see, e.g., *Mongillo* v. *Mongillo*, supra, 69 Conn. App. 482 ("[g]iven the totality of the court's property disposition awards, the court did not act improperly in failing to award the plaintiff a portion of the defendant's pension"). Accordingly, we conclude that the court did not abuse its discretion in its distribution of the parties' pensions.

IV

Finally, the defendant claims that the court abused

its discretion in denying her request for attorney's fees. Specifically, the defendant contends that the court's denial of her claim for attorney's fees "undermines the rest of the financial orders." We disagree.

The following additional facts are necessary to our consideration of this claim. In the defendant's proposed orders, which were filed with the court on the final day of trial, the defendant requested that "[t]he plaintiff shall pay to the defendant $12,000 in attorney's fees." In her financial affidavit submitted on that same date, the defendant stated that she owed her counsel's law firm $11,084 and marked that debt as a "joint" liability. The defendant subsequently filed an affidavit of fees and costs, indicating that she had incurred a total of $24,945.43 in attorney's fees. In his proposed orders, the plaintiff requested that the defendant pay him $5000 in attorney's fees. In his December 20, 2019 financial affidavit, the plaintiff indicated that he owed his counsel's law firm $28,714.

In its memorandum of decision dissolving the parties' marriage, the court noted that the debt listed on the defendant's financial affidavit in connection with her counsel's law firm was the defendant's "sole debt and not a joint debt." The court then ordered that "[e]ach party shall be responsible for the outstanding balances [owed] to their own attorney in connection with these proceedings." The court explicitly stated that it weighed the applicable statutory factors in arriving at this decision.

We begin our analysis by setting forth the applicable legal principles and standard of review. General Statutes § 46b-62 (a) "governs the award of attorney's fees in dissolution proceedings and provides that the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in [§] 46b-82. These criteria include the length of the marriage, the causes for the . . . dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award . . . ." (Internal quotation marks omitted.) *O'Brien* v. *O'Brien*, 138 Conn. App. 544, 556, 53 A.3d 1039 (2012), cert. denied, 308 Conn. 937, 66 A.3d 500 (2013).

"Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so. . . . An exception to the rule . . . is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine its prior financial orders . . . . [A]n award of attorney's

fees in a marital dissolution case is warranted only when at least one of two circumstances is present: (1) one party does not have ample liquid assets to pay for attorney's fees; or (2) the failure to award attorney's fees will undermine the court's other financial orders. . . .

"Whether to allow counsel fees, [under § 46b-62 (a)], and if so in what amount, calls for the exercise of judicial discretion. . . . An abuse of discretion in granting counsel fees will be found only if [a reviewing court] determines that the trial court could not reasonably have concluded as it did." (Citations omitted; internal quotation marks omitted.) *Dolan* v. *Dolan*, 211 Conn. App. 390, 405–406, 272 A.3d 768, cert. denied, 343 Conn. 924, 275 A.3d 626 (2022).

On appeal, the defendant claims that the court's failure to award her attorney's fees undermines the court's other financial orders awarding her a portion of the plaintiff's 457 (b) plan and awarding her alimony. Specifically, the defendant first contends that she "still owed at least [$11,084]" in legal fees, which would constitute approximately one third of the $30,071 that she would receive from the plaintiff's 457 (b) plan. The defendant also argues that the court's denial of attorney's fees "eviscerates virtually the entire alimony awarded," as she would receive approximately $26,000 in alimony over the course of two years and she had incurred a total of approximately $25,000 in attorney's fees.

Viewing the court's financial orders as a whole, however, instead of in isolation, we cannot conclude that the court abused its discretion in declining to award attorney's fees to the defendant.[15] We recognize that the defendant had requested $12,000 in attorney's fees, not the total amount of attorney's fees that she had incurred. Although "ample liquid funds [are certainly] not an absolute litmus test for an award of counsel fees"; (internal quotation marks omitted) *Dowling* v. *Szymczak*, 309 Conn. 390, 411–12, 72 A.3d 1 (2013); the court reasonably could have concluded that the defendant had sufficient funds to pay her attorney's fees without any risk of undermining the efficacy of the court's other financial orders. In addition to being awarded $250 per week in alimony *and* 75 percent of the plaintiff's 457 (b) plan, valued at approximately $30,071, the defendant continued to receive income from her employment, and her February 16, 2020 financial affidavit indicated that she had $5794 in checking and savings accounts.

In light of the record, therefore, the defendant has not demonstrated how the court's "failure to award attorney's fees would [have] undermine[d] the court's other financial orders." *Bornemann* v. *Bornemann*, supra, 245 Conn. 544. Accordingly, we conclude that the court did not abuse its discretion in declining to

award attorney's fees to the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Both children reached the age of majority before the dissolution judgment was rendered. Pursuant to General Statutes § 46b-56c, the court retained jurisdiction to enter educational support orders for higher education expenses as to the parties' younger child, who was twenty years old at the time of the dissolution. This aspect of the court's judgment is not at issue in the present appeal.

[2] The plaintiff previously had filed a motion for order requesting that the court order the parties to cooperate in listing the marital home for sale, as "[n]either party has the financial means to solely pay the household expenses," but the court denied that motion.

[3] The defendant had filed a motion for exclusive use and occupancy of the marital home, which was granted on agreement of the parties.

[4] The court simultaneously denied the defendant's February 6, 2020 motion for contempt, which also alleged that the defendant failed to comply with the terms of the court's October 9, 2019 order. The defendant does not appeal from the court's denial of that motion.

[5] The court did not explicitly resolve the "threshold question of whether the underlying order . . . was sufficiently clear and unambiguous so as to support a judgment of contempt"; (internal quotation marks omitted) *Keller* v. *Keller*, 158 Conn. App. 538, 545, 119 A.3d 1213 (2015), appeal dismissed, 323 Conn. 398, 147 A.3d 146 (2016) (certification improvidently granted); see also *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 468, 165 A.3d 1124 (2017) (civil contempt may be founded only on clear and unambiguous court order); which the defendant also bore the burden to establish as the moving party. See *Puff* v. *Puff*, supra, 334 Conn. 365. Nevertheless, on appeal, the plaintiff concedes that the court's order was sufficiently clear.

[6] At trial, the defendant testified that, while the dissolution action was pending, she had spent approximately $1000 during a trip to Rome, Italy, and approximately $1000 during a trip to Canada. She also testified that she used some funds from the vacation club account toward obtaining her bachelor's degree in psychology.

[7] The defendant also contends that the court "failed to consider the plaintiff's received, and soon to be received, retroactive raises for approximately three . . . years of employment that also included extra duty and overtime."

At trial, Jessica Criscuolo, the payroll supervisor for the city of New Haven, testified that the plaintiff was entitled to certain wage increases, retroactive to July, 2016, which he would receive in three equal payments of $2780.62, separate from his regular weekly paycheck. Criscuolo testified that the plaintiff already had received one payment in November, 2019, and would receive the remaining two payments in July, 2020, and July, 2021, if he was still actively employed by the New Haven Police Department. Criscuolo further testified that, apart from the retroactive payments, the raises were reflected in the plaintiff's most recent paychecks.

Our review of the record confirms that the plaintiff's weekly income as listed on his December 20, 2019 financial affidavit takes the raises into consideration. The defendant has failed to demonstrate how the plaintiff's two remaining retroactive payments, which he would only receive if he remained employed, would affect the income that he received on a regular, weekly basis such that the court was required to consider it as part of the plaintiff's income.

[8] As mentioned previously in this opinion, the court found that the parties' "gross and net incomes are as set forth on their financial affidavits." Given that the court explicitly credited the financial affidavits, the present case is readily distinguishable from *Zaniewski* v. *Zaniewski*, 190 Conn. App. 386, 210 A.3d 620 (2019), on which the defendant heavily relies. See id., 390, 392 (court did not make factual finding as to whether it credited parties' financial affidavits or trial testimony with respect to parties' respective gross incomes and did not otherwise set forth what evidence it relied on in reaching its conclusions).

[9] At trial, the defendant testified that she previously had a 401 (k) plan before she was employed by the Department of Children and Families and that she received the funds from that account in 1998, before the parties were married.

[10] The following colloquy took place:

"[The Defendant's Counsel]: Your Honor, this was really just an attempt

to be completely transparent in terms of . . . it's her . . .

"The Court: But it's not the value of the pension.

"[The Defendant's Counsel]: . . . [T]hen I'll own that. . . . [M]y apology, Your Honor. I didn't intend it to be that, I just wanted to be clear for the court how much had accumulated to date.

"The Court: If it's a defined benefit plan, it's certainly worth a lot more than what's shown on the financial affidavit.

"[The Defendant's Counsel]: . . . [W]e're happy to amend that, Your Honor. There was nothing on there before.

"The Court: All right, that's fine. You don't need to amend it. I just . . . so I understand where it comes from."

On a financial affidavit filed after the date of the dissolution, the defendant again marked the value of her pension as "unknown."

[11] In the present case, the parties do not dispute that their pension benefits are distributable property.

[12] Because we conclude that the court distributed the pensions in a manner consistent with the present division method, there is no merit to the defendant's argument that the court "could have" used the present division method pursuant to *Bender* v. *Bender*, supra, 258 Conn. 733, but did not, and that the use of such a method "would have been particularly appropriate in this case . . . ."

[13] Contrary to the defendant's contention, our Supreme Court's analysis in *Bornemann* was not based on any determination that the plaintiff in that case "purposefully provided the court with as little information as possible" or that he "essentially misled the court." See *Bornemann* v. *Bornemann*, supra, 245 Conn. 535.

[14] Utilizing only the total value of the contributions made by the employee to value a pension "is inaccurate because it does not recognize the appreciation of the contributions . . . ." *Bender* v. *Bender*, supra, 258 Conn. 757 n.10.

[15] To the extent that the defendant also argues that she should have been awarded attorney's fees simply because the court chose to award her alimony, and that both involve consideration of the same equitable factors, we are not persuaded. See, e.g., *Hornung* v. *Hornung*, 323 Conn. 144, 177, 146 A.3d 912 (2016) (equitable factors justified alimony award but not attorney's fees award); *Koizim* v. *Koizim*, 181 Conn. 492, 498, 500–501, 435 A.2d 1030 (1980) (equitable factors justified lump sum and periodic alimony awards but not attorney's fees award).