******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

MARGARET MARSHALL *v.* JOHN MARSHALL II
(AC 45727)

Alvord, Cradle and Westbrook, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court dissolving his marriage to the plaintiff and ordering the plaintiff to pay him certain alimony and child support. At the time of trial, the defendant had been unemployed for approximately five years. On the basis of the defendant's past employment, the trial court found that he had an earning capacity of $350,000 per year. The plaintiff worked as an equity partner at M Co., an investment banking firm that she cofounded in 2012. As a partner of M Co., the plaintiff did not receive a base salary or a draw but, rather, received a percentage of the partnership's yearly net profits in the form of distributions. Each year, the partners of M Co. determine the percentage of yearly net profits that each partner will receive. The plaintiff's percentage of net profit had decreased each year from 2018 through 2021, when the trial began. Her distributions also fluctuated from year to year, and she received a total of $1.3 million in 2020 and $2.3 million in 2021. The distributions were received sporadically throughout the year, usually toward the end of the year or the beginning of the following year. The plaintiff received a Schedule K-1 (K-1) from M Co. every year, which she used to determine her net income. Prior to the commencement of the dissolution action, the plaintiff sent a text message to the defendant stating in relevant part that she was planning to reduce her participation in M Co. and was starting her "exit plan." According to the plaintiff's testimony at trial, this text message was merely the result of her being frustrated and upset and she was not in an "exit process." She also testified that she hoped that the text would persuade the defendant to begin seriously looking for employment. The defendant argued that there was a causal relationship between the plaintiff's suggestion that she would reduce her income and the reduction in her percentage of M Co.'s net profits in 2020, alleging that the plaintiff intentionally reduced her income to decrease the amount of alimony and child support she would have to pay to him. In February, 2022, the plaintiff filed a financial affidavit that reflected her 2020 partnership income as shown on her K-1, with a total gross income of approximately $1 million. The plaintiff testified that she relied upon her 2020 K-1 because she had not yet received the 2021 K-1 by the time of trial. Following the trial, the court issued a memorandum of decision in which it found that the plaintiff utilized income for her February, 2022 financial affidavit from 2020, a year during the height of the COVID-19 pandemic, and that the plaintiff had threatened to reduce her income and that her income was then reduced. The court indicated that it was unable to determine the plaintiff's current income based solely on her distributions from 2021 and year to date for 2022 based on the evidence presented, and, therefore, the court utilized the plaintiff's income from her February, 2022 financial affidavit to determine alimony and child support amounts. *Held:*

1. The defendant could not prevail on his claim that the trial court abused its discretion by basing its alimony and child support orders on the plaintiff's 2020 income rather than her 2021 partnership distributions: contrary to the defendant's argument that the trial court made a finding that the plaintiff intentionally had caused her income to be diminished in 2020, this court concluded that the trial court did not make such a finding, as, although the plaintiff's percentage of M Co.'s profit in 2020 was lower than in previous years, the court indicated that there were reasons for the reduction, including that additional partners had been added to M Co., that there had been a global pandemic, and that the plaintiff's economic participation at M Co. had decreased; moreover, the trial court was well within its discretion to base its financial orders on the plaintiff's 2020 income because it was unable to determine her current income based solely on her partnership distributions from 2021 and year to date for 2022 and to find that the distributions that the

plaintiff thus far had received from M Co. in 2022 did not reflect her actual net income because such distributions were separate from what ultimately was shown on her K-1 as income; furthermore, although the defendant was correct that there was ample evidence of the distributions that the plaintiff had received in 2021, the court was not required to accept his position that the distributions were equal to the plaintiff's income, and the record supported a finding that the plaintiff could not accurately calculate her yearly income until she received a K-1, which reflected adjustments to the partnership distributions made by M Co.'s accountants, and, therefore, because adjustments were made to the total distributions that the plaintiff received from M Co., the amount of resources available for support purposes was not apparent from the partnership distributions alone.

2. The defendant could not prevail on his alternative claim that the trial court abused its discretion by basing the awards of alimony and child support on the plaintiff's income as reflected on her financial affidavit rather than on her earning capacity: this court concluded that, because the trial court properly relied on the plaintiff's February, 2022 financial affidavit in fashioning the support orders, the trial court properly exercised its discretion in declining to determine and rely on the plaintiff's earning capacity; moreover, although the court determined an earning capacity for the defendant, it appeared that the court did so because the defendant had not been recently employed, and the court was not required to determine the plaintiff's earning capacity given her continuous employment at M Co. since its creation in 2012 and income documented by her K-1, on which the court could reasonably rely in crafting the support orders.

Argued December 6, 2023—officially released February 27, 2024

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where it was tried to the court, *M. Moore, J.*; judgment dissolving the marriage and granting certain other relief; thereafter, the court, *M. Moore, J.*, denied the defendant's motions for clarification and for reconsideration and reargument, and the defendant appealed to this court. *Affirmed.*

*Campbell D. Barrett*, with whom were *Stacie L. Provencher* and, on the brief, *Dana M. Hrelic*, for the appellant (defendant).

*James P. Sexton*, with whom were *Thomas D. Colin* and, on the brief, *Gail Oakley Pratt* and *John R. Weikart*, for the appellee (plaintiff).

*Opinion*

WESTBROOK, J. In this marital dissolution action, the defendant, John Marshall II, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Margaret Marshall, challenging the factual and legal bases for the court's alimony and child support orders. On appeal, the defendant claims that the court improperly (1) relied on the plaintiff's allegedly manipulated 2020 income in fashioning the alimony and child support orders, rather than relying on the plaintiff's 2021 partnership distributions, and, alternatively, (2) based those support orders on the plaintiff's reported income rather than on her earning capacity. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which were either found by the court or are otherwise undisputed, and procedural history are relevant to our resolution of this appeal. The plaintiff and the defendant were married on September 9, 2000. Three children were born of the marriage, two of whom were minors at the time of the trial. The plaintiff filed for divorce on October 24, 2017.

At the time of the trial, the plaintiff was forty-six years old and worked as an equity partner at M2O, an investment banking firm that she cofounded in 2012. As a partner of M2O, the plaintiff does not receive a base salary or a draw but, rather, receives a percentage of the partnership's yearly net profits in the form of distributions.[1] Each year, the partners of M2O meet to determine the percentage of yearly net profits that each partner will receive.[2] Each partner then receives distributions from M2O equal to his or her percentage of the partnership's net profits. The distributions are not received on a set schedule but, rather, are received sporadically throughout the year, usually toward the end of the year or the beginning of the following year.[3] The plaintiff's percentage of net profit was 21 percent in 2018, 15 percent in 2019, 12 percent in 2020, and 11 percent in 2021. She received distributions totaling $2.4 million in 2018, $1.2 million in 2019, $1.3 million in 2020, and $2.3 million in 2021.

The plaintiff receives a Schedule K-1 (K-1) from M2O every year.[4] The plaintiff refers to her annual K-1 to determine her net income, which reflects the adjustments to the partnership distributions made by M2O's accountants.[5]

In February, 2022, near the end of the trial, the plaintiff filed a financial affidavit that reflected her 2020 partnership income as shown on her K-1. The plaintiff relied on her 2020 K-1 because she had not yet received the 2021 K-1 by the time of trial.[6] The February, 2022 financial affidavit showed a gross weekly income of $20,994 and a net weekly income of $12,183.

At the time of trial, the defendant was fifty-three years old and was unemployed. He was last employed in 2016

as a senior managing director at Focuspoint Private Capital. Although the defendant testified that he was unable to find employment due to a felony conviction in 2013,[7] he was let go from his job at Focuspoint Private Capital in 2016 because of his poor job performance rather than his conviction.[8] The defendant has had several years to seek employment following the commencement of this action but has failed to do so. The defendant has an earning capacity of $350,000 per year.

Following a trial that began on February 17, 2021, and which was primarily held remotely due to the COVID-19 pandemic, the court, *M. Moore, J.*, issued a thorough memorandum of decision on June 13, 2022, dissolving the parties' marriage and issuing, inter alia, alimony and child support orders.[9] The court concluded that the parties' marriage had broken down irretrievably and that the defendant was more at fault than the plaintiff for the marital breakdown. The court found that "the defendant's failure to continue to make a financial contribution to the family and his unilateral decision not to find employment was the primary reason for the breakdown of the marriage."

The court ordered the plaintiff to pay alimony to the defendant in the amount of $1500 per week "until the first to occur of the following events: the death of either party, the defendant's remarriage or cohabitation pursuant to statute and case law, or five years from the date of dissolution." The court did not order the defendant to pay alimony to the plaintiff. In constructing this alimony order, the court "reviewed the standard of living enjoyed by the parties, including the standard of living prior to the filing of the dissolution of marriage, the standard of living after the filing of the dissolution of marriage, and all of the factors incorporated in [General Statutes] § 46b-82 and relevant case law." The court's determination of the duration of the alimony award to the defendant was based on "the court's consideration of all of the factors set forth in . . . § 46b-82 and its determination that this period of time is reasonable to allow the defendant to fulfill his responsibilities under the parenting plan; provide the necessary income for him to become financially independent and self-sufficient in light of his age, educational background and work history; and allow him to maintain a reasonable standard of living that he enjoyed during the marriage while finding full-time employment at a level he had during the marriage."

The court additionally ordered the parties to share joint legal and physical custody of the parties' minor children.[10] To determine the amount of child support to be paid, the court reviewed General Statutes § 46b-84; the Child Support and Arrearage Guidelines (guidelines); relevant case law; the evidence at trial, including the testimony of the parties; the guidelines' worksheets and financial affidavits submitted by the parties; and

the expenses of the children. The court determined that the plaintiff's net weekly income is significantly greater than the guidelines' maximum net income of $4000.[11] After considering the proposed presumptive child support amount submitted by each party, the court concluded that "the presumptive minimum weekly child support to be paid from the plaintiff to the defendant [was] $708 per week." The court ultimately ordered the plaintiff to pay the defendant $1500 per week in child support. The court found this figure reasonable "in light of the [principles] in the Connecticut child support guidelines, the needs of the children, and § 46b-84." The court ordered the plaintiff to "pay child support for each minor child until the child reaches the age of eighteen or graduates high school, whichever occurs later, but in no event past the child's nineteenth birthday."

On July 5, 2022, the defendant filed motions for clarification and for reconsideration and reargument. In his motion for clarification, the defendant sought clarification regarding, inter alia, the current net incomes of the parties[12] and the amount of income that the court attributed to the plaintiff at the time of dissolution.[13] The plaintiff filed an objection to the defendant's motion for reconsideration and reargument on July 8, 2022, arguing that the defendant "provides no basis whatsoever, legal or factual, to warrant reconsideration or reargument on any of these subjects, and his requests are very baldly seeking the proverbial second bite of the apple." The court denied the defendant's motions on July 26, 2022. This appeal followed. Additional facts will be set forth as necessary.

The defendant claims on appeal that the court abused its discretion in determining alimony and child support by relying on (1) the plaintiff's February, 2022 financial affidavit, which reflected her 2020 actual earned income of $1.3 million, rather than relying on the evidence of the approximately $2.3 million in distributions the plaintiff received in 2021 as a partner of M2O; and (2) the plaintiff's income rather than determining and relying upon the plaintiff's earning capacity. The defendant argues that these alleged abuses of discretion, "separately and together, implicate the mosaic of the court's financial orders and warrant reversal with direction to remand for a new trial on the same."[14] The plaintiff counters that there was no abuse of discretion and that, therefore, the judgment of the court should be affirmed. We agree with the plaintiff.

As a preliminary matter, we set forth our standard of review and other relevant legal principles. The "standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . .

It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . .

"Further, [w]e have repeatedly recognized that [i]n determining the assignment of . . . alimony under § 46b-82, a trial court must weigh the station or standard of living of the parties in light of other statutory factors such as the length of the marriage, employability, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. . . . Particularly with respect to alimony, the trial court does not need to give each factor equal weight or make express findings as to each factor, but it must consider each factor. . . . In addition, it is a long settled principle that the [party's] ability to pay is a material consideration in formulating financial awards. . . . Finally, the trial court's financial orders must be consistent with the purpose of alimony: to provide continuing support for the nonpaying spouse, who is entitled to maintain the standard of living enjoyed during the marriage as closely as possible. . . . When exercising its broad, equitable, remedial powers in domestic relations cases, a court must examine both the public policy implicated and the basic elements of fairness." (Citations omitted; internal quotation marks omitted.) *Tilsen* v. *Benson*, 347 Conn. 758, 796–97, 299 A.3d 1096 (2023).

Section 46b-84 governs the award of child support and provides in relevant part: "(a) Upon or subsequent to the . . . dissolution of any marriage . . . the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. Any postjudgment procedure afforded by chapter 906 shall be available to secure the present and future financial interests of a party in connection with a final order for the periodic payment of child support. . . .

"(d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employ-

ability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. . . ."

General Statutes § 46b-215a provides for a commission to oversee the establishment of child support guidelines "to ensure the appropriateness of criteria for the establishment of child support awards . . . ." In support of the application of these guidelines, General Statutes § 46b-215b (a) provides in relevant part: "The . . . guidelines issued pursuant to section 46b-215a . . . shall be considered in all determinations of child support award amounts . . . . In all such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount to be ordered. A specific finding on the record at a hearing, or in a written judgment, order or memorandum of decision of the court, that the application of the guidelines would be inequitable or inappropriate in a particular case . . . shall be required in order to rebut the presumption in such case." See also *Pencheva-Hasse* v. *Hasse*, 221 Conn. App. 113, 123, 300 A.3d 1175 (2023).

In *Dowling* v. *Szymczak*, 309 Conn. 390, 72 A.3d 1 (2013), our Supreme Court provided clear guidance for determining child support obligations in cases of high income families. The court explained that "the [child support guideline] schedule sets forth a presumptive percentage and resultant amount corresponding to specific levels of combined net weekly income; the schedule begins at $50 and continues in progressively higher $10 increments, terminating at $4000. . . . This court has recognized that the guidelines nonetheless apply to combined net weekly income in excess of that maximum amount. . . . Indeed, the regulations direct that, [w]hen the parents' combined net weekly income exceeds [$4000], child support awards shall be determined on a case-by-case basis, and the current support prescribed at the [$4000] net weekly income level shall be the minimum presumptive amount. . . .

"While the regulations clearly demarcate the presumptive minimum amount of the award in high income cases, they do not address the maximum permissible amount that may be assigned under a proper exercise of the court's discretion. . . . [T]his court has remained mindful that the guidelines . . . indicate that such awards should follow the principle expressly acknowledged in the preamble [to the guidelines] and reflected in the schedule that the child support obligation as a percentage of the combined net weekly income should decline as the income level rises." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 400–401.

I

The defendant first claims that the court abused its discretion by relying on the plaintiff's February, 2022 financial affidavit, which reflected the plaintiff's 2020 partnership income as stated in her K-1, despite a wealth of evidence demonstrating that the plaintiff received more compensation in 2021. He argues that it was an abuse of discretion to base the alimony and child support orders on the plaintiff's 2020 income because the plaintiff had intentionally reduced her income in order to decrease the amount of alimony and child support she would have to pay to the defendant. We conclude that there was ample evidence in the record to support the court's decision, and, accordingly, the court did not abuse its discretion in basing the support orders on the plaintiff's 2020 income rather than her 2021 distributions.

The following additional facts are relevant to this claim. In 2019, the plaintiff sent a text message to the defendant stating in relevant part that "[t]he current situation is unacceptable, it's bad for my health, and I've already told my partners I would like to begin reducing my economics at M2O this year. I am starting my exit plan. . . ." This text message, according to the plaintiff, was not sincere but, rather, was the result of her being frustrated and upset.[15] Additionally, the plaintiff hoped that the text would persuade the defendant to begin seriously looking for employment.[16] According to the defendant, however, there was a causal relationship between the plaintiff's suggestion that she would reduce her income and the reduction in her percentage of M2O's net profits in 2020. He stated that the plaintiff intentionally reduced her income to decrease the amount of alimony and child support she would have to pay to him.[17]

The court expressly stated that it had considered all relevant statutory factors in crafting its award of alimony and its award of child support.[18] The court also considered the distributions received by the plaintiff in 2021.[19] In determining alimony and child support, "[t]he court consider[ed] the following: [T]he plaintiff utilized income for her [February] 2022 financial affidavit from 2020, a year during the height of the pandemic. The plaintiff threatened to reduce her income, which is exactly what happened. Moreover, her company has a very informal manner of determining partner percentages. The court, however, is unable to determine the plaintiff's current income based solely on her distributions from 2021 and year to date for 2022 based on the evidence presented; therefore, the court utilizes the plaintiff's income from her [February] 2022 financial affidavit."

The parties disagree over whether the court found that the plaintiff intentionally reduced her income in 2020. As we previously noted, in its memorandum of decision the court stated that "[t]he plaintiff threatened

to reduce her income, which is exactly what happened." The court additionally noted that the plaintiff "testified she was not sincere when she threatened her husband with a reduction of her income; however, it appears the plaintiff's income was in fact reduced during the pendency of this divorce action." The defendant argues that "[t]he trial court . . . very clearly made three findings that reflect deficiencies in the plaintiff's income number from 2020, including its finding that the plaintiff threatened to reduce her income and that her income was thereafter reduced. The trial court nevertheless relied on the 2020 income number despite these glaring deficiencies . . . ."[20] (Emphasis omitted).

The plaintiff counters that "the trial court did *not* make a finding that the plaintiff *intentionally* caused her net income to be diminished. . . . Even read in isolation . . . these sentences do not state that the plaintiff intentionally reduced her income to make good on her threat. . . . All that is clear from those two sentences is that the plaintiff made a threat to reduce her income and that the plaintiff's income appeared to have been reduced. The trial court does not state explicitly that the plaintiff caused her income to drop, intentionally or otherwise." (Emphasis altered.) The plaintiff additionally argues that the sentences should not be read in isolation. In the same section of the memorandum of decision, the court references additional events, such as the global pandemic and the addition of partners to M2O, that may have reduced her income at the time in question. She therefore argues that, "[w]hen the decision is read as a whole, the court did not find that the plaintiff intentionally had reduced . . . her income." We agree with the plaintiff and conclude that the court did not find that the plaintiff had intentionally reduced her 2020 income.

The record reflects that the plaintiff's percentage of M2O's profit in 2020 was lower than previous years.[21] It, however, also indicates that there were reasons for this reduction, including that additional partners had been added to M2O, thereby reducing the percentage of distributions received by each preexisting partner,[22] that there had been a global pandemic,[23] and that the plaintiff's "economic participation" at M2O has decreased since 2019.[24] Additionally, M2O has a payment structure in which its clients may pay M2O for its services over time, rather than in a lump sum.[25] As a result, depending on the payment schedule permitted by M2O and each of its clients, the distributions fluctuate from year to year.[26] The difference in distributions received by the plaintiff in 2020 and 2021 is an example of the variability in M2O's payment structure. In 2020, the plaintiff's percentage of the partnership profits was 12 percent and she received approximately $1.3 million in distributions from M2O. In 2021, the plaintiff received approximately the same percentage, or 11 percent, but she received about $2.3 million in distributions. The

evidence in the record therefore supports the assertion that the plaintiff's 2020 income was reflective of the changes to the partners of M2O, the global pandemic, and the plaintiff's decreased economic participation at M2O, as well as other variabilities of the partnership's payment structure.

The court, additionally, was well within its discretion in basing its financial orders on the plaintiff's 2020 income because it was "unable to determine the plaintiff's current income based solely on her distributions from 2021 and year to date for 2022 based on the evidence presented . . . ." The plaintiff had not yet received her 2021 K-1 by the time of trial,[27] and she accordingly based her February, 2022 financial affidavit on the last K-1 she had received, her 2020 K-1.[28] The distributions that the plaintiff thus far had received from M2O in 2022 did not reflect her actual net income.[29] The plaintiff testified that "distributions are completely separate from what ultimately is shown on [her] K-1 for income" and that she "need[s] the K-1 and the tax return in order to determine what [her] income is." Although the defendant is correct that there is ample evidence of the distributions the plaintiff received in 2021, the court was not required to accept his position that the distributions are equal to the plaintiff's income. The record supports a finding that the plaintiff cannot accurately calculate her yearly income until she receives a K-1, which reflects adjustments to the partnership distributions made by M2O's accountants.[30] The plaintiff's February, 2022 financial affidavit states that "[e]arnings [are] based on [the plaintiff's] 2020 M2O income less qualifying business deductions and do NOT reflect [the plaintiff's] current cash flow. Early-year distributions are generally made only to pay estimated taxes, and [the plaintiff] typically does not receive a substantial portion of her total annual income until the end of the year." (Emphasis in original.) Because adjustments are made to the total distributions that the plaintiff receives from M2O, "the amount of resources available for support purposes"; (internal quotation marks omitted) *Onyilogwu* v. *Onyilogwu*, 217 Conn. App. 647, 654, 289 A.3d 1214 (2023); is not apparent from the distributions alone.

The court's decision to base the support orders on the plaintiff's February, 2022 financial affidavit, which reflected the plaintiff's latest K-1 available at the time of trial, was therefore reasonable in light of the evidence before it. We accordingly conclude that the court soundly exercised its discretion in determining the financial orders based on the plaintiff's 2020 income, despite evidence of later distributions.[31]

## II

The defendant also claims, in the alternative, that the court abused its discretion by not basing the awards of alimony and child support on the plaintiff's earning

capacity, rather than the plaintiff's income as reflected on her financial affidavit. Because we conclude that the court properly relied on the plaintiff's February, 2022 financial affidavit in fashioning the support orders, we conclude that the court properly exercised its discretion in declining to determine and rely on the plaintiff's earning capacity.

"[I]t is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount [that] a person can realistically earn, nor is it confined to actual income, but rather it is an amount [that] a person can realistically be expected to earn considering such things as his [or her] vocational skills, employability, age and health." (Internal quotation marks omitted.) *Tilsen* v. *Benson*, supra, 347 Conn. 799. While the court may consider the earning capacity of each party, it is not required to do so. See *Ingles* v. *Ingles*, 216 Conn. App. 782, 798, 286 A.3d 908 (2022). "It is well settled that [w]hether to base its financial orders on the parties' actual net income or their earning capacities is left to the sound discretion of the trial court." (Internal quotation marks omitted.) Id.

The court in this case did not determine the plaintiff's earning capacity. It, however, was not required to do so. See id. Although the court did determine an earning capacity for the defendant, finding that he had an earning capacity of $350,000 gross yearly income, it appears the court did so because the defendant had not been recently employed.[32] The plaintiff, comparatively, has been continuously employed at M2O since its creation in 2012 and, unlike the defendant, has income as documented by her K-1 on which the court could reasonably rely in crafting the support orders. The court was therefore well within its discretion in choosing to rely on the plaintiff's February, 2022 financial affidavit in determining the financial orders, rather than exercising its discretion to instead calculate and rely upon her earning capacity. Accordingly, we conclude that the court did not abuse its discretion in declining to determine and rely on the plaintiff's earning capacity to determine its financial orders.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] According to a partner of M2O, "[payments from clients] are collected over time. We pay a lot of people during that period of time and then what's left over is net profit. And that net profit is then divided up based on our percentages."

[2] M2O "has a very informal manner of determining partner percentages." "Partner percentages" are each partner's percent share in the distribution of M2O's net profit.

At trial, one of the partners of M2O testified that to determine the percentage for each partner, the partners of M2O "get in a room . . . discuss the projects . . . discuss the relative contribution[s] to those projects and [then] try to figure out appropriate levels of compensation going into the

next year based on that. It's a much more informal process than you might think for a business that has done this level of revenue." The division of profits, according to a partner of M2O, is "largely based on performance. We are a success based business. How we divide up the pot at the end of a year going into the next year is largely based on contributions to the success of the business."

[3] At trial, the defendant's attorney questioned the plaintiff as follows:

"Q. Okay. And that—you get distributions from M2O on a quarterly basis and also in between a quarterly basis, don't you?

"A. Not necessarily, it's ad hoc.

"Q. So, the quarterly ones that appear on your distribution schedule are paid, and then there are other months where, according to the production provided, shows that there's, for instance, a payment in March as well as April. So, there are times you get other payments in your distributions—at distributions throughout the year, is that correct?

"A. They're all ad hoc.

"Q. Okay. Well, each—each partner at M2O has a contract describing when their payments would be made, isn't that correct?

"A. No.

"Q. So, the contract—there's no contract in terms of when you get paid?

"A. Not that I'm aware of.

* * *

"Q. Has there ever been a time since you started this business that you haven't gotten a distribution between August and January 1 of the following year?

"A. I have never received—I think I would typically be—I mean, I'm generally receiving distributions in the second half of the year and oftentimes one in January which relates to the following calendar—or the prior calendar year."

[4] "A schedule K-1 is the document that states each individual partner's proportionate income or loss based upon [his or her] percentage ownership. The income or loss on the schedule K-1 is in turn reported on each partner's individual tax return." (Internal quotation marks omitted.) *Grogan* v. *Penza*, 194 Conn. App. 72, 75 n.2, 220 A.3d 147 (2019).

[5] The defendant's attorney questioned the plaintiff as follows:

"Q. Okay. So, there is—the monies [distributions] that you receive are counted as your income, correct? For which you have not had to pay them pay for monies that you've over—been overpaid?

"A. I—I think that my testimony was that the income is gonna be a subset of the distributions.

"Q. I don't think you testified as to that, and I don't understand what that means. What do you mean a subset?

"A. If you look at the K-1, there's two—there—it shows what distributions were made and then there's also, like, an income part and then there's interest and there's other things and there's a whole bunch of deductions and until I have all of that I can't answer your question in terms of my income.

"Q. So, you're saying that the distributions are not income to you? What you receive throughout the year—

"A. Some—

"Q. —and in 2021, you received $2.3 million. Are you saying that's not going to be your income for 2021?

"A. That's—that's going to be some portion of my income. . . .

"Q. And why would it be reduced 2.3? What—what portion is not going to be counted as your income?

"A. That's where I don't understand exactly what the—the accountants do at Eisner and Ampner, but they make adjustments."

[6] The defendant's attorney questioned the plaintiff about the timing of the K-1 as follows:

"Q. Okay. And have you received a K-1 for 2021?

"A. No.

"Q. And when do you typically get K-1s?

"A. April."

[7] The court found that, "[i]n 2013, the defendant plead[ed] guilty to assault in the second degree with a motor vehicle. The defendant consumed alcohol before driving head-on into another driver in 2010. He spent approximately thirty days in jail in 2013 and was convicted of a felony."

[8] The court found that the defendant "was let go because he refused to work hard and meet the goals of his employment. The felony conviction played no part in his termination from his employment at Focuspoint . . . ."

[9] The court additionally issued orders that are not at issue on appeal,

including orders regarding the division of the parties' marital property, insurance, educational support, and counsel fees.

[10] The court, in relevant part, awarded the parties parenting time with the two minor children on a week on/week off basis.

[11] Connecticut's child support guidelines; see Regs., Conn. State Agencies § 46b-215a-1 et seq.; contain a schedule of basic child support obligations, "which supplies presumptive levels of support on the basis of the parents' combined net weekly income, but only up to $4000 of such income." *Dowling* v. *Szymczak*, 309 Conn. 390, 393, 72 A.3d 1 (2013).

[12] The defendant argued that "the court did not make findings regarding the current 'net income' of either party. . . . The defendant requests [that] the court clarify the amount of its net income determinations for each of the parties and the bases for those determinations."

[13] The defendant argued that he "presented undisputed evidence with respect to the plaintiff's distributions in 2021 and year to date 2022. The court stated in its [memorandum of decision] that the plaintiff received partnership distributions from M2O in 2021 of $2.3 million . . . . However . . . the court stated [that] it relied on the plaintiff's 2020 income, which was reflected in her financial affidavit dated February 25, 2022." (Citation omitted.)

[14] "Financial orders in dissolution proceedings often have been described as a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Because the court's support orders, particularly its spousal support or alimony order, are informed by and reflective of the parties' incomes and assets, as affected by the court's other financial orders, the entirety of the mosaic must be refashioned whenever there is error in the entering of any such interdependent order." (Internal quotation marks omitted.) *Onyilogwu* v. *Onyilogwu*, 217 Conn. App. 647, 657–58, 289 A.3d 1214 (2023).

[15] The defendant's attorney questioned the plaintiff as follows:

"Q. So, you were planning to—so you were planning to exit—you were starting your exit plan, meaning you were planning to leave your job so that you would force [the defendant] to get a job, is that what your testimony is?

"A. I'd say some of this I wasn't at my best, perhaps, you know, in the best frame of mind because I clearly was upset, throwing a lot in this text, and I never had such a conversation with my partners, and I'm not in an exit process.

\* \* \*

"Q. Did you ever indicate to [the defendant] that you were going to not only leave your job but reduce your income?

"A. I don't remember that. If I said it, it was me being just upset.

"Q. Do you recall saying you were going to renegotiate something with M2O to get around the divorce process?

"A. I don't recall that specifically, but again, if I did, it was probably not my best moment. I'm sure I was upset about something."

[16] The defendant's attorney questioned the plaintiff as follows:

"Q. And—yes, and you said, when I asked you that previously, you said that was a mistake, I was upset. What did—why did you say that was a mistake? Were you trying to reduce your economics at M2O or not?

"A. No, I guess it was, probably, you know, I was hoping that maybe he would actually take seriously the fact that he—he needs to get a job."

[17] The defendant's attorney questioned the plaintiff as follows:

"Q. All right. And since the filing of the divorce, your percentage has dropped each year, isn't that true?

"A. Yes, it has due to changes in the business.

"Q. Okay. Was that a part of your divorce plan? To reduce your income?

"A. No.

"Q. Did you ever—did you ever put in writing that you were going to make an effort to reduce [your] interest in M2O prior to a divorce action?

"A. I remember sending [the defendant] some texts along those lines.

"Q. Okay. And you said to him that you were going to reduce so you didn't have to pay him alimony?

"A. That might not have been my finest hour. I don't remember exactly what I said, but there were some heated moments.

"Q. Okay. So, you admit you have said that to him in the past?

"A. I didn't say—I don't recall saying that exactly, but something like that definitely could've been said.

"Q. Okay. And do you also recall saying that you would want to renegotiate a document to get around paying him alimony with M2O?

"A. I—I don't remember that, but again, there were a lot of heated debates

between us, so it's possible."

[18] With regard to alimony, the court stated in its memorandum of decision that it had "reviewed the standard of living enjoyed by the parties, including the standard of living prior to the filing of the dissolution of marriage, the standard of living after the filing of the dissolution of marriage, and all of the factors incorporated in § 46b-82 and relevant case law."

With regard to child support, the court further stated: "The court has reviewed the State of Connecticut Child Support and Arrearage Guidelines effective July 1, 2015, § 46b-84, relevant case law, the evidence at trial, the testimony of the parties, and the guideline worksheets submitted by the parties. The court has reviewed the financial affidavits submitted by the plaintiff and the defendant and the expenses of the children. The plaintiff's net weekly income is significantly greater than the maximum guideline net income of $4000. The plaintiff has submitted child support guidelines which show a presumptive child support amount of $708 to be paid by the plaintiff to the defendant. The defendant submitted child support guidelines attached to his amended proposed orders which show weekly income to the defendant of $1731 gross and $1546 net and the plaintiff's net weekly income of $24,407. The plaintiff lists the presumptive child support per week to be paid from the plaintiff to the defendant in the amount of $2557. The court has also considered the shared physical custody of the children."

[19] The court stated in its memorandum of decision that "[t]he plaintiff testified she utilized her 2020 income for the financial affidavit filed in February, 2022. The plaintiff testified to partnership distributions in 2021 of $2.3 million. She also testified her percentage of income for 2021 and 2022 is 11 percent."

[20] The defendant additionally refers to the plaintiff's 2020 income as "intentionally depleted . . . income," "intentionally reduced income," and "intentionally manipulated income" throughout his appellate brief.

[21] As a partner of M2O, the plaintiff receives a percentage of its profits each year. "The plaintiff . . . testified her percentage of income for 2021 and 2022 is 11 percent. In 2016, her percentage of income was 27.9 percent and in 2017 it was 27 percent. In 2018, her percentage dropped to 21 percent because, the plaintiff testified, M2O added a partner. In 2019, the plaintiff's percentage was reduced to 15 percent and then to 12 percent in 2020."

[22] The defendant's attorney questioned Michael Custar, a partner of M2O, as follows:

"Q. And was the reason for [the percentage decline from 2020 to 2021] because your secondary market, which you run, was affected by COVID?

"A. No. I believe the principal reason was because we had a new partner admitted. So, we were all diluted."

[23] The court noted that the reduction in the plaintiff's income occurred at "the height of the pandemic."

[24] The defendant's attorney questioned Michael Custar, a partner of M2O, as follows:

"Q. Okay. Is there a reason that a new partner has . . . [a] very similar [profit] percentage to [the plaintiff] while the other partners' percentages are higher?

"A. Yes, based on production.

* * *

"Q. What aspect of her performance in the prior year caused her to be at 11 percent profit percentage?

"A. No origination that resulted in revenue I believe and a relatively lower distribution percentage relative to other partners in terms of sales percentage."

[25] The defendant's attorney questioned Luke Belcastro, a partner of M2O, as follows:

"Q. Okay. And how and when are these fees paid?

"A. They are paid upon—they are earned upon success.

"Q. Okay.

"A. We typically allow our clients to pay us over time and that time can be anywhere [from] four quarters to ten quarters typically, probably six to ten is more typical quarter. So, if you were to earn a dollar of revenue, we would allow them to pay us over time.

"Q. So, a year and a half to three years?

"A. To two years, exactly, yeah.

"Q. And but you are only paid once the funding mandate is completed, once you secure the funds, right, then your part is done but they then have, as you say, six to ten quarters to pay those fees?

"A. As we have closings, we earn the fee. From that point on, they would

pay us on a schedule based on what was negotiated at the outset. So again, if it's eight quarters, on whatever date we had a closing where the manager has collected the—has the committed dollars to their fund, we earn a fee. And in the case quarters, we would get paid pro rata over the next eight quarters for that fee."

[26] The defendant's attorney questioned Luke Belcastro, a partner of M2O, as follows:

"Q. Okay. So, if you have a great year [of] accounts receivable, you might only have a so-so year that same year with revenue because those receivables will be paid out over, as you said, six to ten months? The receivables and distributions might be different.

"A. Right. Clients could also elect to pay us in a lump sum or they could elect to pay us over time. So, the difference—you know, our distributions can change and fluctuate based on what our clients chose to do, either paying us as agreed in the schedule or deciding to pay us in—to prepay a portion of that. It all depends on what our clients do."

[27] See footnote 6 of this opinion.

[28] The plaintiff has consistently based the partnership income reported on her financial affidavits on her K-1 from two years prior. When she filed her March, 2021 financial affidavit, she used her 2019 K-1 because she had not received her 2020 K-1 from M2O by the date of filing.

[29] The plaintiff's attorney questioned the plaintiff as follows:

"Q. Can you explain the difference [between income and distributions]?

"A. The distributions are completely separate from what ultimately is shown on my K-1 for income. I mean, certainly there's some portion of those distributions [that] wind up being income, but I can't know, until the audit is complete, and the taxes are ready to be filed, what the income is.

"Q. And that hasn't happened yet for calendar year [2021]?

"A. That hasn't happened yet for [2021]."

The defendant's attorney also questioned the plaintiff as follows:

"Q. Okay. So, in spite of the fact that you have received distributions this year in 2021, and we are in August, you did not include the income that you have received in 2021, but you relied on 2020 income for this [August, 2021] financial affidavit?

"A. Distributions don't necessarily equal income so until I have my K-1 for 2021, I—I cannot give you an exact figure for what that is."

[30] See footnote 4 of this opinion.

[31] The defendant is not precluded from filing a motion for modification of the support orders in the event of a substantial change to the plaintiff's income. Pursuant to General Statutes § 46b-86, "[u]nless and to the extent the decree precludes modification, any final order for the periodic payment of permanent alimony or support . . . may, at any time thereafter, be continued, set aside, altered or modified by the court upon a showing of a substantial change in the circumstances of either party . . . ." But see *McKeon* v. *Lennon*, 321 Conn. 323, 334–35, 138 A.3d 242 (2016) (increase in supporting spouse's income alone ordinarily will not justify modification of alimony award but "the trial court may consider a substantial increase in the supporting spouse's income, standing alone, as sufficient justification for granting a motion to modify a child support order . . . .").

[32] The defendant was last employed as a senior managing director at Focuspoint Private Capital in 2016, five years prior to the start of trial.